**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Rodolfo VENZOR–CASTILLO, Defendant–Appellee.**

No. 92–2190.

United States Court of Appeals, Tenth Circuit.

April 14, 1993.

Rehearing Denied June 8, 1993.

Kelly H. Burnham, Asst. U.S. Atty. (Don J. Svet, U.S. Atty., with her on the brief), Las Cruces, NM, for plaintiff-appellant.

Charles A. Harwood, Silver City, NM, for defendant-appellee.

Before McKAY, Chief Circuit Judge, SETH, Senior Circuit Judge, and MOORE, Circuit Judge.

JOHN P. MOORE, Circuit Judge.

■ The United States appeals from an order of the district court granting defendant Rodolfo Venzor–Castillo's motion to suppress evidence the government intended to introduce in defendant's trial for alien smuggling. 816 F.Supp. 683. The evidence was obtained from a Border Patrol stop of his vehicle. The government attacks the district court's holding that the Border Patrol agent lacked reasonable suspicion to make the stop. The district court found that the stop was unreasonable because it occurred approximately 235 miles from the United States–Mexico border on a road that is not a direct route from the border and passes through thirteen New Mexico towns and cities between the nearest border point of entry and the location of the stop. The court held the location was not "a reasonable distance from any external boundary of the United States" within the meaning of 8 U.S.C. § 1357(a)(3). We agree and affirm.

The essential facts found by the district court are not disputed by the government. We shall, therefore, rely upon them.

On June 14, 1992, United States Border Patrol Agent David Smith was patrolling New Mexico State Highway 36, a lightly traveled roadway in a remote area of the northern portion of Catron County, New Mexico. That part of Highway 36 is located in a sparsely populated area of Western New Mexico near the Arizona border, virtually in the center of the North–South axis of the state and approximately 235 miles north of the Mexican border. The district court found the most direct route to this portion of Highway 36 starts at Palomas, Mexico, the nearest border crossing, and passes through thirteen New Mexico towns or cities.[1] In addition, the section of Highway 36 involved here is a segment of the highway route that extends from the Mexican border to I–40, an east-west interstate highway. The route traverses New Mexico Highways 11, 12, 32, and 117 and U.S. Highway 180. It is also noteworthy that Quemado, New Mexico, south of the point where Agent Smith was working, is on U.S. Highway 60, a direct link between Highway 36 and the nearby Arizona border.

Agent Smith's supervisors recently had assigned him, an agent with over ten years of experience, to patrol the north Catron County area for a week because of an increase in cases of alien smuggling in the area. During the month prior to Agent Smith's assignment, local law enforcement authorities had reported nine cases involving the arrest of thirty undocumented aliens in that location.

---

1. The district court noted, "The route Agent Smith apparently assumed the defendant travelled—north from Mexico in the I-25 corridor then westward on New Mexico Highway 152 into Catron County—totals approximately 350 road miles."

Border Patrol authorities believed alien smugglers were travelling through Catron County more frequently to avoid the permanent checkpoint located near Truth or Consequences, New Mexico. In their opinion, the Catron County route allowed smugglers to circumvent that known checkpoint and still return to I–25 for a direct route to Albuquerque and points north.

At 4:00 p.m., within half an hour after arriving at this location, Agent Smith and two other agents were standing next to a marked Border Patrol vehicle along the edge of Highway 36. Agent Smith noticed the defendant's car as it headed north around a curve. When he first spotted the car, he observed four or five occupants seated upright. As the car approached Agent Smith, however, he saw the passengers in the back seat slide down. Agent Smith also noted the car appeared to be heavily loaded with its undercarriage close to the road surface causing the tail pipe to drag on the road when the car hit bumps. He stated the vehicle was a large, older model Cadillac, which he often found to be favored by alien smugglers. Agent Smith thought it noteworthy that the three occupants in the front seat stared straight ahead as they passed him instead of looking toward him and his companions or the marked patrol car as most travelers do under similar circumstances.

Agent Smith and his partner followed the defendant's car for a few miles, observing, in the meantime, the car had a temporary license in the rear window instead of a license plate. With binoculars, Agent Smith also distinguished the tops of three heads in the back seat. The agents then stopped the car. After determining the five passengers were undocumented aliens, Agent Smith arrested the driver, defendant Venzor–Castillo.

In ruling upon the defendant's motion to suppress the evidence obtained as a result of the stop, the district court was struck by the distance from the border at which the stop occurred. Interpreting 8 U.S.C. § 1357(a)(3), which authorizes any immigration agent "without warrant ... within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle," the court determined it was bound by "a legislative limitation on the range within which United States border patrol agents ... may patrol in an effort to detect alien smuggling." The regulations interpreting this section define a "reasonable distance" as "within 100 air miles from any external boundary of the United States." 8 C.F.R. § 287.1(a)(2). The district court also found, when the defendant was encountered, he was driving on a highway during a summer afternoon when legitimate tourist traffic is greater than at other times of the year. Finally, the court found the point of the stop is more than 100 direct air miles from the border.

After analyzing the cases and the statute, the district court concluded the stop of the defendant violated the Fourth Amendment, stating:

> The distance of the stop from the border, coupled with the fact that the route to the closest border crossing point leads through thirteen different United States towns or cities before reaching the point of the stop, and the absence of specific information the defendant's vehicle recently had crossed the border, suggest that Agent Smith lacked reasonable suspicion to believe that the Cadillac was coming from the border area and that alien smuggling was occurring when he stopped the defendant's vehicle.

Reviewing a ruling on a motion to suppress, we accept the trial court's findings of fact unless clearly erroneous. *United States v. McKinnell,* 888 F.2d 669, 672 (10th Cir.1989) (citing *United States v. Cooper,* 733 F.2d 1360, 1364 (10th Cir.), *cert. denied,* 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984)). "The ultimate determination of reasonableness under the fourth amendment is, however, a conclusion of law that we review de novo." *Id.* (citation omitted).

We start our analysis with a review of the legal and constitutional principles that bring us to the question at hand. The

foundation of the review is the proposition that the right of government agents to stop and search travelers *at international borders* has never implicated Fourth Amendment principles. *Carroll v. United States,* 267 U.S. 132, 153–54, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). In particular, probable cause has never been required to justify invasive actions that take place there. Indeed, the Court stated in *United States v. Ramsey,* 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977):

> Border searches ... from before the adoption of the Fourth Amendment, have been considered to be "reasonable" *by the single fact that the person or item in question had entered into our country from outside.* There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause.

(emphasis added). Essential to that rationale is the principal fact that the person or object searched has come from across the border. *See Carroll,* 267 U.S. at 154, 45 S.Ct. at 285; *United States v. Montoya de Hernandez,* 473 U.S. 531, 537–38, 105 S.Ct. 3304, 3308–09, 87 L.Ed.2d 381 (1985).

Nonetheless, to broaden the government's search authority, Congress enacted 8 U.S.C. § 1357(a)(3) as part of the Immigration and Nationality Act. Notwithstanding the breadth of power ostensibly conferred by that section, the Supreme Court held the statute cannot allow conduct which violates the Constitution. *Almeida–Sanchez v. United States,* 413 U.S. 266, 272, 93 S.Ct. 2535, 2538, 37 L.Ed.2d 596 (1973). Consequently, in recognition of the government's power to exclude aliens and to effect that power "by routine inspections and searches of individuals or conveyances seeking to cross our borders," the Court conceived the government's right to stop and search without probable cause at places that are the "functional equivalent[ ]" of the border. *Id.* At the same time, however, the Court held a roving patrol 20 miles from the border "was of a wholly different sort." *Id.* at 273, 93 S.Ct. at 2539. Because that stop was not at the functional equivalent of the border, the Court applied Fourth Amendment considerations and determined it was unreasonable.

Expanding upon the power to stop in view of the important public consideration of protecting our borders, the Court held, subsequently, Border Patrol officers on roving patrol need not have *probable cause* to conduct investigatory stops. However, they "may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *United States v. Brignoni–Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975).[2]

Although the Court made clear stops occasioned within a reasonable distance from the border may be predicated upon reasonable suspicion, it did not decide how to define the limitation in § 1357(a)(3) that such stops be within a "reasonable distance" from the border.[3] We have found no other case in which the concept was in issue. Nonetheless, this case requires that we determine whether the limitation contained in § 1357(a)(3) outweighs the remaining factors that lead to a determination of reasonable suspicion.

---

**2.** We later held, "[A]n investigatory stop is justified when an officer 'observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot.'" *United States v. Monsivais,* 907 F.2d 987, 990 (10th Cir.1990) (quoting *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968)).

**3.** We note, as did the district court, the Supreme Court seems to have assumed in *Brignoni–Ponce* that the 100 mile limit in the administrative regulation is a barrier which Border Patrol officers cannot cross. The court stated, "The only formal limitation on that discretion [to stop vehicles on the highway] appears to be the administrative regulation defining the term 'reasonable distance' in § 287(a)(3) [8 U.S.C. § 1357(a)(3)] to mean within 100 air miles from the border." 422 U.S. at 882–83, 95 S.Ct. at 2581. We have held the regulation does not foreclose searches beyond the limit. *United States v. Leyba,* 627 F.2d 1059, 1065 (10th Cir.), *cert. denied,* 449 U.S. 987, 101 S.Ct. 406, 66 L.Ed.2d 250 (1980). Because we believe the distance involved here was not reasonable in any case, we need not decide whether our holding in *Leyba* is in conflict.

■ No discussion of this issue can begin without a statement of the obvious: whether a stop is occasioned within a "reasonable distance" from the border cannot be gauged in finite terms. Thus, like other areas of the law in which we are governed by a standard of "reasonableness," we must base this judgment upon the totality of all the existing circumstances of a particular case.[4]

The government minimizes the issue of reasonability, however. Emphasizing the court must view the totality of all relevant circumstances as they are perceived by an experienced Border Patrol agent, *Brignoni-Ponce*, 422 U.S. at 885, 95 S.Ct. at 2582, the government argues the trial court erred in focusing on distance as the controlling factor in the analysis. Under the *Brignoni-Ponce* standard, the prosecution argues, distance from the border is only one of a number of factors. *See id.* at 884–85, 95 S.Ct. at 2581–82. Moreover, the government posits that because the Court only determined the standard required for a stop within 100 air miles of the border under 8 U.S.C. § 1357(a)(3), *Brignoni-Ponce* does not imply agents cannot stop cars over 100 miles from the border or need more than reasonable suspicion for a stop.

The government's argument is not without logic; however, it fails to recognize the foundation upon which the Border Patrol's authority to stop is based. We believe nothing previously said by the Court has denigrated the essential factor that the leeway of employing reasonable suspicion instead of probable cause is based upon the hypothesis that the person or object searched has come from outside the country.

In most cases, distance is not a problem because stops are ordinarily made close to or on a direct route from the border. This case is different from the ordinary because of the enormity of the distance from the border coupled with the number of towns and cities through which the supposed route ran. When that factor is taken into consideration with the fact Agent Smith had no idea at all where defendant actually entered the road,[5] distance assumes a critical posture. As a consequence, all the other factors relied upon by Agent Smith diminish in value. Because the power of Border Patrol agents on roving patrol to make a stop founded only on reasonable suspicion originates with "the single fact that the person ... entered into our country from outside," *Ramsey*, 431 U.S. at 619, 97 S.Ct. at 1980, the first question we must ask is whether, under the circumstances of this case, it is reasonable for Agent Smith to have assumed defendant and his passengers came from the border. To hold otherwise is to ignore the origins of the government's right to conduct the invasive activity of stopping travelers en route.

■ This conclusion is neither novel nor inconsistent with other authority. For example, *United States v. Melendez–Gonzalez*, 727 F.2d 407 (5th Cir.1984), underscores the very point in issue here. The stop in that case was made only 60 miles from the international border. Yet, holding the stop unreasonable, the court stated:

When a person is traveling within our country, ... we are more hesitant to allow interference [than at the border], even if the vehicle is close to the border. For this reason, this Court has repeatedly emphasized that one of the vital elements in the *Brignoni–Ponce* reasonable suspicion test is whether the agents had reason to believe that the vehicle in question recently crossed the border. When the stop occurs a substantial distance from the border, we have found this element missing.

727 F.2d at 411 (citations omitted). Similarly to the circumstances here, the road

---

**4.** While law enforcement officers may regard this as a shifting and impossible standard upon which they are called to rely, it is the only test that can fairly be made applicable to all cases. Yet, although judged from the comfort of hindsight, it is not an impossible standard to follow.

**5.** In fact, as far as Agent Smith knew at the time, defendant could have come from Arizona and not Mexico.

upon which Melendez–Gonzalez was stopped passed through two towns, causing the Fifth Circuit to observe, "If a vehicle is already past towns in this country, the mere fact that it is proceeding on a public highway leading from the border is not sufficient cause to believe the vehicle came from the border." *Id.* Additionally, we must be cognizant, as the Court was in *Brignoni–Ponce*, that "[r]oads near the border carry not only aliens seeking to enter the country illegally, but a large volume of legitimate traffic as well." 422 U.S. at 882, 95 S.Ct. at 2581. The further one gets from the border, the greater the likelihood the volume of legitimate travelers will increase. Thus, the more attenuated the international border becomes, the greater the significance distance assumes in the equation used to measure the power to stop only on reasonable suspicion when the officer has no knowledge whatever about the point of origin of a particular traveler's route. Naturally, if the officer has an articulable basis for believing that point was across an international border, distance will have far less significance in judging the reasonableness of the officer's decision.

The government does not address this concern. Citing *United States v. Leyba,* 627 F.2d 1059, 1065 (10th Cir.), *cert. denied,* 449 U.S. 987, 101 S.Ct. 406, 66 L.Ed.2d 250 (1980), the government merely contends that we have ruled, so long as Fourth Amendment considerations have been met, a stop is reasonable "even when the stop is made more than 100 miles beyond the border." Yet, we said only:

> Leyba interprets [§ 1357(a)(3)] as foreclosing searches beyond the 100 mile limit. We do not read Congress' intent as such. If Fourth Amendment considerations are met, such stops are permissible where "criminal activity is afoot." In any event, Leyba does not contest the Court's finding that the stop occurred less than 100 *air* miles from the United States–Mexican border.

627 F.2d at 1065. Nonetheless, the *Leyba* court was not called upon to decide whether the stop was otherwise within a reasonable distance from the international border.

Indeed, the situation which governed the *Leyba* court's decision is in stark contrast to this case. Here, the point of the stop was hundreds of miles beyond the border on a road bisecting a multitude of entry points, including an adjoining state. Those circumstances severely undercut any assumption the point of origin was across an international border. Given this distinction, we do not find ourselves in conflict with *Leyba.*

The government also points to *United States v. Magana,* 797 F.2d 777, 782 (9th Cir.1986), a case in which a stop was made 1500 miles north of the border, and argues the case demonstrates the factor of distance cannot be singled out as determinative of the issue of reasonableness. A careful reading of the opinion, however, makes clear the court did not consider the legislative limitation of reasonableness set forth in § 1357(a)(3). We are not persuaded, therefore, that *Magana* is valuable precedent for the problem we face.

The government also cites *United States v. Garcia,* 732 F.2d 1221, 1225 (5th Cir. 1984). We think, however, that case supports our view because, although concluding officers had reasonable suspicion under the totality of circumstances for a stop which occurred 115 miles from the border, the court noted, "[A] vital element of the *Brignoni–Ponce* test is whether the agent had 'reason to believe that the vehicle [in question] had come from the border.'" 732 F.2d at 1223 (quoting *United States v. Lamas,* 608 F.2d 547, 549 (5th Cir.1979) (citations omitted)).

■ So that we shall be clearly understood, and to place this case in the context of all the others decided by this court involving stops by roving border patrols, we emphasize, when an immigration stop is justified only on reasonable suspicion, the distance from the border becomes critical when the circumstances will not permit a reasonable presumption the traveler came from beyond the international border. The fact the defendant in this case could have entered the highway from any one of the thirteen towns and cities between the clos-

est point of entry on the border and the point of the stop, coupled with the equally plausible fact he could have come from a neighboring state, simply inhibits a belief that the defendant and his passengers had recently crossed the Mexican border. Thus, we conclude the stop did not occur within a reasonable distance from any external boundary of the United States and, therefore, was contrary to the authority granted by 8 U.S.C. § 1357(a)(3). Under that circumstance, the standard of reasonable suspicion cannot be used to justify the agent's invasive action.

**AFFIRMED.**