DENNIS, Circuit Judge,
dissenting:
Because I believe that the roving border patrol stop on 1-20 occurred too far from the border for the agent to have authority to make a stop without probable cause or, even if he had authority, to have had a reasonable suspicion that the vehicle was transporting undocumented aliens, I respectfully dissent.
The roving patrol stop occurred on Interstate 20, a coast to coast highway, 200 to 300 miles from the Mexican border, near Penwell, Texas, which is only about 25 miles from the Texas-New Mexico state line. Thus, the vehicle stopped was traveling on a major transcontinental traffic artery heavily used by motorists from all over the United States and from foreign countries. The place at which the vehicle was arrested was nearer to the Texas-New Mexico state line and numerous population centers in those states than it was to the external United States boundary abutting Mexico. The Border Patrol agent admitted that he could not tell whether the vehicle had come from the border rather than from towns or states within the United States.
The more serious and fundamental question of law presented is whether a Border Patrol agent has the authority, without a warrant or probable cause, to make a roving patrol stop at such a great distance from our nation’s external boundaries. In United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Government contended that, in the areas adjacent to the Mexican border, the Border Patrol has authority to stop moving vehicles operated or occupied by persons of apparent Mexican ancestry and question the occupants about their citizenship, even when its officers have no reason to believe that the occupants are aliens or that other aliens may be concealed in the vehicle. The Government relied principally on 8 U.S.C. § 1357(a)(3), which, in pertinent part, authorizes agents, without a warrant, “within a reasonable distance from any external boundary of the United States, to board and search for aliens any ... conveyance, or vehicle, ... for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States[.]” Under the pertinent regulations, this authority could be exercised anywhere within 100 miles of the border. 8 C.F.R. § 287.1(a)(1975).
But the Supreme Court held that, because no act of Congress can authorize a violation of the Constitution, it must decide “whether the Fourth Amendment allows such random vehicle stops in the border areas.” United States v. Brignoni-Ponce, 422 U.S. 873, 877-878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (citing Almeida-Sanchez v. United States, 413 U.S. 266, 272, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973)). The Court weighed (a) the valid public interest in effective measures to prevent the illegal entry of aliens at the Mexican border, against (b) the interference with individual liberty that results when an officer stops an automobile and questions its occupants, and concluded that the Fourth Amendment required the Court “to limit exercise of the authority granted by both [8 U.S.C. § 1357(a)(1) and § 1357(a)(3)].” Id. at 884, 95 S.Ct. 2574. Specifically, the Court limited the Border Patrol’s statutory and regulatory authority to make roving patrol stops within the border area as follows: “In the context of border area stops, the reasonableness requirement of the Fourth Amendment demands something more *584 than the broad and unlimited discretion sought by the Government.... Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articula-ble facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country.” Id. at 882, 884, 95 S.Ct. 2574.
In the case of Brignoni-Ponce, the officers had relied on a single factor to justify stopping his car near a closed fixed checkpoint south of San Clemente: the apparent Mexican ancestry of the occupants. The Court held that, although Mexican appearance may be a relevant factor, it in itself does not justify stopping all persons of Mexican ancestry to ask if they are aliens. The Court stated:
We cannot conclude that this furnished reasonable grounds to believe that the three occupants were aliens. At best the officers had only a fleeting glimpse of the persons in the moving car, illuminated by headlights. Even if they saw enough to think that the occupants were of Mexican descent, this factor alone would justify neither a reasonable belief that they were aliens, nor a reasonable belief that the car concealed other aliens who were illegally in the country. Large numbers of native-born and naturalized citizens have the physical characteristics identified with Mexican ancestry, and even in the border area a relatively small proportion of them are aliens. The likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not justify stopping all Mexican-Amerieans to ask if they are aliens.
Id. at 886-87, 95 S.Ct. 2574.
As I read Brignoni-Ponce, the Supreme Court’s authorization of roving Border Patrol stops on the basis of reasonable suspicion is limited to such stops within the 100 mile border zone created by 8 U.S.C. § 1357(a)(3) and 8 C.F.R. § 287.1. It would be unreasonable to assume that the Supreme Court meant to dilute the protections of the Fourth Amendment so as to authorize the Border Patrol to make suspicion-based roving patrol stops anywhere in the United States. The Court’s opinion indicates no such intention. The Court said that the effect of its opinion was to place limits on the Border Patrol’s statutory and regulatory authority to make vehicle stops for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States. The statutory authority itself, 8 U.S.C. § 1357(a)(3) is limited to “a reasonable distance from any external boundary of the United States.” “Reasonable distance” was and still is defined by 8 C.F.R. § 287.1(a)(2), for purposes of automobile stops, as “100 air miles from any external, boundary of the United States or any shorter distance which may be fixed by the district director.... ” Throughout its opinion, the Brignoni-Ponce Court limited its holding repeatedly to the “border area,” referring to the area “within 100 air miles of the 2,000-mile border.” Id. at 882-83, 95 S.Ct. 2574. Thus, it is clear that the stop in the present case did not occur within a reasonable distance from any external boundary of the United States and, therefore was contrary to both the authority granted by 8 U.S.C. § 1357(a)(3) and the safeguard of the Fourth Amendment. Accordingly, it is evident that the seizure in this case was both unlawful and unconstitutional because the agent did not have probable cause to believe that the defendant was violating the immigration laws.[1] Cf. United States v. Venzor-Castillo, 991 F.2d 634, 637 n. 3 (10th Cir.1993) (acknowledging that in *585 Brignoni-Ponce the Supreme Court seems to have assumed that the 100 air mile limit in the administrative regulation is a barrier that Border Patrol officers cannot cross, but not reaching that issue since the distance of 235 miles from the Mexican border was unreasonable in any case).
Additionally, even if we were to make the unwarranted assumption that this court can expand the Border Patrol’s authority to make suspicion-based stops within the 100 mile border zone granted by Congress in 8 U.S.C. § 1357(a)(3), and as defined by 8 C.F.R. § 287.1(a)(2) and the Supreme Court in Brignoni-Ponce, there was no basis for a reasonable suspicion that the defendant was transporting undocumented aliens in the present case. When an immigration stop is not based on probable cause, but purportedly on reasonable suspicion, the distance from the border becomes critical if the circumstances will not permit a reasonable presumption that the traveler came from beyond the international border. See United States v. Melendez-Gonzalez, 727 F.2d 407, 411 (5th Cir.1984); United States v. Lamas, 608 F.2d 547, 549 (5th Cir.1979). The fact that the defendant in the present case could have entered 1-20 from any one of the numerous towns and cities between the nearest point of entry on the border and the point of the stop, coupled with the equally plausible fact that he could have come from a neighboring state, substantially inhibits a belief that the defendant and his passenger had recently crossed the Mexican border. As a consequence, each of the other ambiguous factors relied upon by the Border Patrol agent accordingly are diminished in their ability to serve as a basis for reasonable suspicion.
The Border Patrol agent evidently first focused his attention on the defendant and his companion simply because they appeared to be of Mexican ancestry. However, “[t]he likelihood that any given person of Mexican ancestry is an alien ... standing alone [ ] does not justify stopping all Mexican-Americans to ask if they are aliens.” Brignoni-Ponce, 422 U.S. at 886-87, 95 S.Ct. 2574. Even if the likelihood might increase with the number of Mexican-Americans involved, a proposition which has not been approved by the Supreme Court, the only area of the vehicle in which a number of undocumented aliens could have been hidden was in the tarpaulin-sealed truck cargo bed. The absence of air-holes or other ventilation, however, made it highly unlikely that any persons were concealed there during a six or seven hour drive from the Mexican border through West Texas on a hot day in May. Under these circumstances, the ambiguous facts reported by the agent — e.g., a truck with a heavy load or weak springs, a driver who disregarded a man in an unmarked automobile, a slumping or sleeping passenger, and a spare tire in the back seat (where it could be locked up) — did not *586 provide a basis for a reasonable suspicion that aliens were secreted in the truck bed.
Consequently, I believe the roving patrol stop in this case was unlawful because it was not authorized by 8 U.S.C. § 1357(a)(3), 8 C.F.R. § 287.1, or the Constitution as interpreted by the Supreme Court in Brignoni-Ponce and, alternatively, because there was no basis for a reasonable suspicion that the defendant and his companion had entered or transported others into the country illegally.

. I respectfully disagree with footnote three of the majority opinion, (i) I do not agree that two circuits have expressly held that stops and searches made beyond the 100-mile border zone do not foreclose the application of the Brignoni-Ponce factors. As I read United States v. Magana, 797 F.2d 777, 780 (9th Cir.1986) and United States v. Leyba, 627 F.2d 1059 (10th Cir.), cert. denied, 449 U.S. 987, 101 S.Ct. 406, 66 L.Ed.2d 250 (1980), neither *585 held, expressly or otherwise, that the Brignoni-Ponce factors apply to all stops and searches without regard to the "reasonable distance” limitation in 8 U.S.C. § 1357(a)(3), defined by 8 C.F.R. § 287.1 as "100 air miles from any external boundary of the United States." As the Magana court never referred to these statutory and regulatory provisions, I agree with the Tenth Circuit that "[a] careful reading of the opinion [] makes clear the court did not consider the legislative limitation of reasonableness set forth in § 1357(a)(3) [and I am] not persuaded, therefore, that Magana is valuable precedent for the problem we face.” United States v. Venzor-Castillo, 991 F.2d 634, 639 (10th Cir.1993). On the other hand, the Leyba court found that the stop occurred within 100 air miles from the United States-Mexican border and that the defendant did not contend otherwise, necessarily relegating to mere dicta any conflicting interpretation or application of these "reasonable distance” provisions within the context of Brignoni-Ponce. See Leyba, 627 F.2d at 1065. (ii) Because application of the Brignoni-Ponce factors to stops outside the 100 air-mile border zone conflicts with the Supreme Court’s opinion in Brignoni-Ponce itself, I do not agree that this dissent cites no Supreme Court precedent in support of this contention; (iii) nor do I agree that Orozco failed to raise the issue below given that he relies heavily upon Brignoni-Ponce to demonstrate the violation of his Fourth Amendment protections against unreasonable seizure.